# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 6151 | **DATE** | 3/30/2001 |
| **CASE TITLE** | CLUB, et al. v. City of Chicago | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Defendant's Motions for Summary Judgment (doc. #126, 151);
Plaintiffs' Motion for Summary Judgment (doc. #128)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motions for summary judgment (doc. #126 and 151) are GRANTED; Plaintiffs' motion for summary judgment (doc. #128) is DENIED.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | MAR 3 0 2001 date docketed | |
| ✓ | Docketing to mail notices. | | 165 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| C.L.U.B. (Civil Liberties for Urban Believers), Christ Center, Christian Covenant Outreach Church, His Word Ministries to All Nations, Christian Bible Church, Monte DeSion (Mount Zion) Church, Plaintiffs, | ) ) ) ) ) ) ) | **DOCKETED** MAR 3 0 2001 |
| v. | ) ) | **CASE NO. 94CV6151** **JUDGE WILLIAM J. HIBBLER** |
| CITY OF CHICAGO, Defendant. | ) ) | |

## MEMORANDUM AND ORDER

CLUB and a collection of individual churches ("Plaintiffs") and the City of Chicago ("Defendant")
filed cross motions for summary judgment; also, the City filed a motion for summary judgment on Count
XIV of Plaintiffs' Fourth Amended Complaint, i.e. the Religious Land Use and Institutionalized Persons Act
(RLUIPA). The issues have been fully briefed and thus are now ripe for adjudication. For the following
reasons, this Court **GRANTS** Defendant's motion for summary judgment (doc. #126), **DENIES** Plaintiffs'
motion for summary judgment (doc.#128) and **GRANTS** Defendant's motion for summary judgment on
Count XIV of Plaintiffs' fourth amended complaint (doc. #151).

## BACKGROUND

### Prior Opinions and Procedural History

On October 11, 1994, Plaintiffs filed their first complaint in this case; on November 9, 2000,
Plaintiffs filed their fourth amended complaint, which is currently before this court. Plaintiffs' prior
complaints were the subject of five written opinions by Judge Andersen and a published opinion by the
Seventh Circuit Court of Appeals, which held Aldermen William Banks and Patrick Huels to be absolutely

1

protected by legislative immunity for their particular actions related to zoning ordinances. *See C.L.U.B. v. City of Chicago*, No. 94 C 6151, 1996 WL 89241 (N.D.Ill. Feb. 27, 1996)(*"CLUB I"*), *rev'd in part by Biblia Abierta v. Banks*, 129 F.3d 899 (7th Cir. 1997); *C.L.U.B. v. City of Chicago*, No. 94 C 6151, 1996 WL 697630 (N.D.Ill. Nov. 20, 1996)(*"CLUB II"*); *C.L.U.B. v. City of Chicago*, No. 94 C 6151, 1997 WL 43226 (N.D.Ill. Jan. 27, 1997)(*"CLUB III"*), *rev'd by Biblia Abierta*; *C.L.U.B. v. City of Chicago*, No. 94 C 6151, 1997 WL 94731 (N.D.Ill. Feb. 28, 1997)(*"CLUB IV"*); *C.L.U.B. v. City of Chicago*, No. 94 C 6151, 1997 WL 102552 (N.D.Ill. Mar. 6, 1997)(*"CLUB V"*), *rev'd in part by Biblia Abierta*.

## Chicago Zoning Ordinances

The regulation of land uses within the City is set forth as the Zoning Ordinance in Title 17 of the Municipal Code of Chicago. Generally, the City is divided into several broad use districts: Residence ("R"), Business ("B"), Commercial ("C"), or Manufacturing ("M"). Each zone contains various sub- districts (e.g. R1, R2, R3, etc.); the Zoning Ordinance also sets forth the uses allowed within each sub-district. These zoning categories apply to all property except that zoned as a Planned Development. Approximately 40% of the City is zoned as R districts, with the remaining parts of the City divided into B, C, or M districts.

Within each sub-district, certain uses are allowed as of right ("permitted uses), while other uses are allowed as "special uses" and require approval from the City's Zoning Board of Appeals ("ZBA") and still other uses are prohibited under any circumstances. The ZBA will consider an application for a special use permit only after a public hearing is noticed and held, and a written report is prepared and filed with the ZBA by the Commissioner of Planning and Development. Art. 11.10-2. In considering whether to grant a special use permit, the ZBA makes an ad hoc determination as to what impact the special use will have on other entities in the district. Art. 11.10- 1. A permit will not be granted unless the special use: (1) complies with public convenience; (2) does not threaten public health, safety, and welfare; (3) does not diminish the value of nearby property; (4) complies with Articles 7, 8, and 9 of the Chicago Zoning Ordinance; and, (5)

conforms with applicable regulations in the district. Art. 11.10-4. Further, the Commissioner of Planning and Development may recommend, and the ZBA may consider in its discretion, other factors, e.g. off-street parking and loading. Art. 11.10-5. Upon receiving an application, the ZBA often notifies the alderman of the respective ward for which the special use permit application was filed and may consider the input of the alderman on whether a special use permit should be granted for a particular location. Additionally, the ZBA permits neighbors and community groups to testify at its hearings concerning the pending application. The overall cost of obtaining a special use permit ranges from $4,000 to $5,000; moreover, if property is used in violation of the Zoning Ordinance, the City may impose daily fines and issue injunctions.

In particular, the Zoning Ordinance treats churches as follows: (a) within all R districts, churches are permitted uses as of right; (b) within all B districts, churches are special uses, and thus must obtain a permit to locate in these areas; (c) within C1, C2 and C3 districts, churches are also special uses; and (d) within the C4 district and all M districts, churches are not permitted. Art. 7-10. The treatment of churches today within the various districts is largely the same as it was in 1957, the year in which the Zoning Ordinance was last comprehensively amended.

In each of their complaints, Plaintiffs have argued churches require special use permits to locate in B and C districts, while other similar uses may locate in B, C and M districts as permitted uses. In response to this litigation, the City Council recently amended the Zoning Ordinance as to certain uses Plaintiffs maintain are similar to churches. *Chicago City Council Journal of Proceedings*, February 16, 2000, p. 25997-26013. Under the amended ordinance, "clubs and lodges," "meeting halls," and "recreation buildings and community centers" are now required to obtain special use permits to locate in B and C districts, the same as churches. However, unlike churches, none of these allegedly similar uses are permitted uses in all R districts. Further, with respect to only churches, the amendments to the Zoning Ordinance removed the requirement for a special use permit that an applicant affirmatively demonstrate the proposed use is

3

"necessary for the public convenience at that location." *See Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 885, 887 (1990)("[C]ourts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."). Further, the amended ordinance automatically grants a special use permit if the ZBA does not render a decision within 120 days of the date of a church's application.

## Factual History[1]

Plaintiff Civil Liberties for Urban Believers ("CLUB") is an unincorporated association of approximately 40 to 50 churches located in Chicago, Illinois and the surrounding suburbs.[2] CLUB challenges zoning laws it maintains restrict the free exercise of religion and other freedoms of its own members. The individual member churches of CLUB are incorporated as Illinois religious or not-for-profit corporations and range in size from 15 to 15,000 members. In the present action, CLUB and five of its individual church members, Christ Center, Christian Covenant Outreach Church ("Christian Covenant"), His Word Ministries to All Nations ("His Word"), Christian Bible Church ("Christian Bible"), and Monte De Sion Church ("Mount Zion"), allege fourteen counts in their Fourth Amended Complaint arising from zoning challenges.

Christ Center began meeting in a high school auditorium in 1990, but soon experienced difficulties

---

[1] Throughout the documents he has filed with the court, Plaintiff's counsel continues to include plaintiffs and defendants that have been dismissed. For example, Aldermen Huels and Banks were dismissed as defendants from this case by Judge Andersen on March 18, 1998, in response to the Seventh Circuit's decision in *Biblia Abierta*, and yet Plaintiffs' counsel continues to include them in his captions and in his complaint (e.g. Pl. Compl. at 26-27: Plaintiff's prayer for relief requests $1.3 million from Huels). Similarly, the State of Illinois was dismissed as a defendant by Judge Andersen in *CLUB I*, and yet counsel continues to feature the State. *CLUB I*, 1996 WL 89241, at *17. Plaintiff's counsel displays a lack of preparation and organization and risks wasting the court's time and resources.

[2] While it is unclear who its members are or even the precise number of members, the court in *CLUB I* found "CLUB has associational standing to pursue declaratory and injunctive relief on behalf of its members actually injured." *CLUB I*, 1996 WL 89241, at *15.

at this location due to various school functions that interrupted weekly worship. As a result, Christ Center began searching for a building to purchase. The church was unsuccessful in locating an appropriate building in any R districts. In the summer of 1992, Christ Center located a suitable building at 1139-43 West Madison in Chicago. The building was located in a C district and Christ Center promptly applied for a special use permit. After completing the application process, Christ Center reached out to gain the support of neighbors and Alderman Theodore Mazola. Most neighbors favored a taxpaying entity in the neighborhood rather than a church and Alderman Mazola stated that he would support the church's special use permit on any street but Madison. The Zoning Board eventually convened a special hearing on September 18, 1992. On October 18, 1992, the special use permit was denied. Christ Center subsequently found a second building in an M district at 123 South Morgan. The owner of the building also agreed to provide financing. However, the Chicago Department of Planning and Development informed Christ Center that it would oppose any rezoning application because the particular area was designated to become an entertainment area and the presence of a church would inhibit such development. Christ Center subsequently choose not to file an application for rezoning. In the fall of 1993, Christ Center obtained property at 4445 South King Drive, successfully obtained a special use permit and now operates a church at this location. Christ Center now claims that it paid substantial sums in attorneys fees, appraisal fees, zoning application charges, title charges and other expenses attempting to find suitable property.

Between 1986 and the summer of 1988, Christian Bible met in a private home. The church eventually outgrew this space and began meeting in a funeral home. The funeral home, however, proved aesthetically and administratively problematic. In 1990, Christian Bible located a suitable building in a B district at 83rd and Essex. Alderman Beavers promptly informed Christian Bible that "he would not allow" a church at that location. Consequently, Christian Bible did not apply for a special use permit at this location. In March 1991, Christian Bible purchased property in another B district at 513-23 East 75th Street.

The Park Manor Neighbors Association and Alderman Steele both opposed the church's special use permit application. On May 17, 1991, the permit was denied. Christian Bible then unsuccessfully attempted to sell the building for 10 months. In February 1992, Christian Bible renovated the building to enhance its appearance. During these renovations, the church rented space at another location, or held meetings at private homes. Christian Bible later reapplied for a special use permit which was granted on August 20, 1993 with the support of neighbors in the district. Christian Bible now claims the delay in obtaining a special use permit prevented the church from obtaining a real estate tax exemption. The church further alleges that it also paid substantial sums in expenses related to the application process and also suffered a decrease in membership. Christian Bible now owns and meets at a church at 6210 S. St. Louis and has successfully obtained a special use permit to operate the church.

From February, 1988 to December, 1993, Mount Zion rented space in a C district at 4545 North Kedzie. During this period, Mount Zion never applied for a special use permit. In 1990, a City inspector ordered Mount Zion to vacate the building. In April 1993, Mount Zion located suitable rental property at 3949 North Pulaski, and applied for a special use permit. During this process, the Zoning Board informed Mount Zion that the building lacked adequate parking accommodations for a church and both the building and each parking lot would require special use permits. Alderman Wojcik and a neighborhood group also opposed Mount Zion's application. Consequently, Mount Zion withdrew its application for a special use permit. Mount Zion now owns and meets in a church at 3807 N. Lavergne.

On November 1, 1992, Christian Covenant first rented property in a C district. The owner of the building offered to co-sign a loan enabling Christian Covenant to purchase the property. However, City inspectors ordered Christian Covenant to stop using the building as a church without a special use permit. As a result, Christian Covenant did not purchase the building out of fear the City would not allow the building to be used as a church without a special use permit. Christian Covenant now owns and meets in a

6

church located in an R district.

Between 1990 and 1992, His Word met in the basement of a private home until membership outgrew these accommodations. In 1992, His Word located a suitable building in a C district at 1616 West Pershing. On March 27, 1992, the church signed a purchase contract contingent upon the grant of a special use permit. After filing their special use permit application, His Word met with neighbors in the district who generally supported it. Alderman Patrick Huels stated he would neither support nor oppose the application. On three separate occasions, at the request of Alderman Huels, the Zoning Board postponed a hearing on His Word's application. On October 14, 1992, Alderman Huels introduced an amendment to the Chicago Zoning Ordinance to rezone the property located at 1616 West Pershing from a C district to an M district. After a hearing on December 10, 1992, Alderman William Banks and other aldermen on the Chicago Committee on Zoning of the Chicago City Council voted to recommend approval of the amendment. Both His Word and Citibank, the owner of the building, opposed the rezoning. On December 15, 1992, the Chicago City Council voted to enact the rezoning amendment changing 1616 West Pershing from a C district to an M district. His Word subsequently withdrew its application for a special use permit; the church spent a considerable sum on filing, attorney's and appraiser's fees. His Word now owns and meets in a church located in an R district.

### Plaintiff's Claims and Causes of Action

Plaintiffs' Fourth Amended Complaint contains fourteen counts. Both Plaintiffs and Defendant have filed motions for summary judgment, so for purposes of clarity, the court will address Plaintiffs' counts in clusters. Plaintiff argues (1) the Zoning Ordinance violates the equal protection clauses of the United States and Illinois Constitutions because it treats churches worse than other allegedly similar uses in specific

districts (Counts II, VIII)[3]; (2) the process by which zoning legislation is approved by the City Council, and the process by which the ZBA reviews and approves special use applications, deprives Plaintiffs of procedural due process (Count III); (3) the City's Zoning Ordinance violates the first amendment to the United States and Illinois Constitutions because it deprives Plaintiffs of their rights to free exercise of religion, free speech and freedom of assembly (Counts V-VII, IX-XI); (4) the City's Zoning Ordinance violates the Illinois Religious Freedom Restoration Act (IRFRA)(Count XIII); (5) the City's re-zoning of 1616 W. Pershing Road was unconstitutional as to Plaintiff His Word Ministries (Count XII), under a variety of theories; and (6) the City's Zoning Ordinance violates RLUIPA (Count XIV).

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is appropriately entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir.1996) (citations omitted). A plaintiff cannot rest on mere allegations of a claim without any significant probative evidence that supports his complaint. *Id.; see First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually

---

[3] To maintain consistent count numbers with prior versions of complaints, Plaintiff intentionally omitted Counts I and IV from the Fourth Amended Complaint.

unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986). Accordingly, the non-moving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Id.* at 324. Nevertheless, in determining the existence of any genuine issue of material fact, the court must draw all reasonable inferences in the light most favorable to the non-movant. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

## ANALYSIS

### Equal Protection

Counts II and VIII argue the Zoning Ordinance violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article 1 § 2 of the Illinois Constitution.[4] In particular, Plaintiffs allege the Zoning Ordinance allows similar uses to operate as permitted uses in certain B, C, and M districts, while churches must obtain a special use permit to locate in B and C districts and are prohibited from locating in M districts (e.g. clubs, lodges, community centers, recreation centers, restaurants, theaters and colleges).

The Equal Protection Clause mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "Equal protection limits the power of a legislature to target a particular individual, organization, or group by requiring that the legislature confer benefits or impose costs on a larger, neutrally defined group; it cannot pick on just the most vulnerable." *L C & S, Inc. v. Warren County Area Plan Commission*, -- F.3d -- , No. 00-3062, 2001 WL 294312, at *1 (7th Cir. March 28, 2001). The Supreme Court has established the appropriate standards

---

[4] Equal protection challenges brought under the Illinois Constitution are evaluated under the same standards as equal protection claims under the federal constitution. *Nevitt v. Langfelder*, 157 Ill.2d 116, 124, 623 N.E.2d 281, 284 (Ill. 1993).

for determining the validity of state legislation, e.g. zoning ordinances, under the Equal Protection Clause:

> Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classifications challenged be rationally related to a legitimate state interest.

*City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

If the legislative classification negatively affects such a suspect class, then courts may uphold the classification only if it is "precisely tailored to serve a compelling governmental interest." *Sklar v. Byrne*, 727 F.2d 633, 636 (7th Cir. 1984)(quoting *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982)). Absent an invidious or gender-based classification, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. Further, this Circuit has interpreted the above and established the particular application of the Equal Protection Clause to municipal land use decisions. "Absent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land-use context, the plaintiff must demonstrate governmental action wholly impossible to relate to legitimate governmental objectives." *Forseth v. Village of Sussex*, 199 F.3d 363, 370-71 (7th Cir. 2000); *see also Olech v. Village of Willowbrook*, 160 F.3d 386, 387-88 (7th Cir. 1998), *aff'd*, 528 U.S. 562 (2000); *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995); *Unity Ventures v. County of Lake*, 841 F.2d 770, 775 at n.2 (7th Cir. 1988).

First, the Court will address the theory of the present churches constituting a suspect class. While individuals of a particular religious faith may constitute a suspect class requiring heightened scrutiny, there is no proof churches as an entity qualify as a suspect class here. In the context of the Zoning Ordinance, owners of "churches" are operators of the physical structure in which people gather to celebrate and are not a suspect class. *See International Church of the Foursquare Gospel v. City of Chicago Heights*, 955 F.Supp. 878, 881 (N.D.Ill. 1996)(zoning ordinance excluding churches from B districts was rational and survived

equal protection challenge); *see also Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 471-72 and

fn. 13 (8th Cir. 1991)(classification of churches for land use planning was not analogous to classification based

upon the "religious status" of the faithful; zoning ordinance controlling the location of churches was properly

evaluated under the rational basis test); *KDM v. Reedsport School District*, 196 F.3d 1046, 1051-52 (9th Cir.

1999)("parochial school students are not a suspect class."). While this conclusion is a narrow distinction, it

is an important distinction, because a classification based upon the religious preferences of an individual may

trigger heightened scrutiny but a classification that merely touches upon religion in general is subject to the

standard rational basis equal protection review.

Second, the Zoning Ordinance at issue does not infringe upon a fundamental right to trigger

heightened scrutiny. In order to raise the equal protection analysis to heightened scrutiny under the

fundamental rights theory, a challenged ordinance must produce "grave interference with important religious

tenents" or "affirmatively compel [church members] to perform acts undeniably at odds with fundamental

tenents of their religious beliefs." *Griffin High School v. Illinois High School Assoc.*, 822 F.2d 671, 674 (7[th]

Cir. 1987)(rule that made it more difficult for student-athletes to transfer to private, religious schools did not

infringe upon the free exercise of religion and merited the standard rational basis scrutiny). Here, the Zoning

Ordinance cannot be reasonably interpreted to regulate religious beliefs or compel individuals to perform any

acts. Rather, the Zoning Ordinance simply limits the location of church buildings, which is not the regulation

of belief, any more than regulating the location of the *Chicago Tribune* building is the regulation of the

newspaper's first amendment-protected product. The City has the responsibility to create and implement a

land use plan for the city as a whole and supervising the location of churches in this regard is clearly

distinguishable from regulating an individual's right to pray, worship or celebrate. Plaintiffs' claims of a

suspect class and a fundamental right[5] fail to prove the need for heightened scrutiny and instead merit an equal protection review under the traditional rational basis standard.

Under the rational basis inquiry, the amended Zoning Ordinance as a whole passes the rational basis test. As a preliminary matter, the division of municipal land into various districts and the prohibition of certain uses from each district is a common and accepted practice. *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926)(affirming zoning plan that divided town into use districts and prevented land owner from using property in preferred manner). Further, government has a valid public policy motive in proper urban planning. "A city may use zoning regulations as an exercise of the police power to protect residents from the ill effects of urbanization, such as crowding, encroachment of commercial businesses or industries, traffic congestion, and noise." *Cohen v. City of Des Plaines*, 8 F.3d 484, 494 (7th Cir. 1993). *See also L C & S, Inc.*, 2001 WL 294312.

In the present case, the City's Zoning Ordinance addresses these goals. By authorizing churches to operate in R districts as a permitted use of right, the City recognizes the historical connection between strong and healthy residential communities and churches. Outside these residential districts, though, the City reasonably maintains churches are less suited to B and C districts, since the goals of these districts to promote business and commerce may be hurt by such non-commercial uses. *International Church of the Foursquare Gospel*, 955 F.Supp. at 881. Such broad generalizations may not always be helpful, so the City recognizes exceptions to this general rule. The Ordinance contains a mechanism to allows churches to obtain special use permits to operate in B and C districts.[6] However, in B and C districts, the quarrel between churches and

---

[5] Furthermore, in the present case, many of the individual church Plaintiffs are corporations, and it is well established that corporations lack fundamental rights. "Corporations do not have fundamental rights; they do not have liberty interests, period." *Mid-American Waste Sys., Inc. v. City of Gary, Ind.*, 49 F.3d 286, 291 (7th Cir. 1995).

[6] Apparently, this mechanism has worked in at least a small fashion, since Plaintiffs Christ Center and Christian Bible Center obtained special uses permits for their current churches.

industrial uses might be so significant that the City could rationally conclude the two uses cannot share the area. From the perspective of community management, there are clear economic and social justifications for the City's overall zoning scheme, and these reasons have nothing to do with religion. *Cf. Concerned Citizens of Carderock v. Hubbard*, 84 F.Supp.2d 668, 671-73 (D.Md. 2000)(zoning ordinance that permitted churches to operate as of right in a residential district, but required "private clubs" and other allegedly similar uses to obtain a special use permit, did not violate the Establishment Clause; the zoning scheme was motivated by a legitimate secular purpose, i.e. "development which is harmonious and compatible with single family residential use."). Thus, the City's decision to more extensively regulate churches in B, C, and M districts than in R districts is rational.

As stated above, the City's zoning scheme must be viewed as a whole, with attention focused as to how the pieces combine to form the complete zoning scheme. Pursuant to the February 2000 amendments to the Zoning Ordinance[7], most of the uses allegedly similar to churches receive the same treatment.[8] With respect to the remaining allegedly similar uses (e.g. restaurants, taverns, theaters), these uses have a commercial character that differentiates them from churches and makes them a better fit with other uses allowed in B and C districts. The City could determine reasonably that uses cited by Plaintiffs have an industrial character that separates them from churches and makes those uses more appropriate for the industrial districts. *International Church of the Foursquare Gospel*, 955 F.Supp. at 881. Thus, as it pertains

---

[7] Plaintiffs argue the fact the City amended the Zoning Ordinances in response to its claims proves the unfairness of the Ordinances; however, this litigation "operated as a wake-up call" to the City and the City "cannot be criticized for having taken a long time to wake up to the need to" adjust and adapt the Ordinances to treat uses differently to reflect the resources and needs of an area. *L C & S , Inc.*, 2001 WL 294312, at *5.

[8] *CLUB I, II, III, IV* and *V* refer to the treatment of churches and similar uses under the old ordinance and under a different standard of review; the amendments adjusted and aligned the uses and districts and thus the factual analyses under these past opinions are of questionable value.

to churches, the Zoning Ordinance is rationally related to a legitimate governmental purpose and survives equal protection analysis.

## Due Process

Count III appears to challenge the "procedures" by which the City Council zones or re-zones land and the standards used by the ZBA to determine whether to issue a special use permit. However, the court finds it difficult to determine what types of due process claims Plaintiffs have alleged, i.e., whether Plaintiffs are mounting a facial challenge to the Zoning Ordinance or merely complaining of the its procedures, or both. Apparently, Plaintiffs' second amended complaint clarified Plaintiffs' initial claims somewhat in this regard, *CLUB IV*, 1997 WL 94731, at *2, but Plaintiffs' fourth amended complaint is still unclear. This court will presume Plaintiffs' attack is both a facial challenge to the zoning scheme as a whole and a challenge to the City Council and ZBA's procedures.

In order to assert a due process claim, a plaintiff must demonstrate a "legitimate claim of entitlement" to the right asserted. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1479 (7th Cir. 1990). The Seventh Circuit has recognized the liberty to use one's land as one desires is such a property right within the meaning of due process. *See River Park, Inc. v. City of Highland Park*, 23 F.3d 164 (7th Cir. 1994). Further, when the right to use property is affected by an administrative decision, e.g. the denial of a special use permit, a "deprivation" of constitutional rights is at issue and procedural due process is warranted. *Id.* at 166.

The procedures "due" in zoning cases are minimal. *Id.* (citing *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668 (1976)). "Federal courts are not boards of zoning appeals." *Id;. New Burnham Prairie Homes*, 910 F.2d at 1481; *Estate of Himelstein v. City of Fort Wayne, Ind.*, 898 F.2d 573, 578 (7th Cir. 1990). As to the City Council's legislative enactments and the ZBA's processes, the law is clear that the procedures by which these legislative bodies enact legislation provides all the process that is due.

*River Park*, 23 F.3d at 166. Municipalities are not required to use adjudicative procedures to make zoning decisions, but may elect to use the political process with no hearings of any kind. *River Park*, 23 F.3d at 166 (citing *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467-68 (7th Cir. 1988)). "'Legislative due process' seems almost an oxymoron." *LC & S*, 2001 WL 294312, at *1. Because the due process clause permits municipalities to use political methods to decide zoning cases, "the only procedural rules at stake are those local law provides, and these rules must be vindicated in local courts." *River Park*, 23 F.3d at 167. Thus, parties contesting that "state or local regulation of the use of land has gone overbroad must repair to state court." *Id.* Further, the Zoning Ordinance explicitly provides for the review of zoning decisions by the Illinois Circuit Courts. *See Chicago Zoning Ordinance* § 11.3-4; 65 ILCS 5/11-13-13; 735 ILCS 5/3-104.[9] Therefore, Plaintiffs' claim the Zoning Ordinance fails to provide adequate due process as required by the due process clause of the Fourteenth Amendment is rejected.

## First Amendment Claims

Plaintiffs' Counts V, VI, VII, IX, X and XI allege the Zoning Ordinance violates churches' First Amendment rights as to free exercise of religion, freedom of speech and freedom of assembly.

### Free Exercise

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const., amend. I (1791). As applied to the states by the Fourteenth Amendment, the free exercise clause prohibits local governments from making discretionary (i.e., not neutral, not generally

---

[9] In evaluating the facts before it when it ruled on the motion to dismiss in *CLUB I*, the court interpreted the present matter as an extraordinary zoning matter, with a remedy laying beyond state court. However, since Plaintiffs challenge the "vague" zoning standards and procedures, such an attack is one that might be presented by any property owner seeking a special use permit, i.e. it is a claim focused on property rights rather than any particular use or "fundamental liberty." Thus, it is a claim that attacks a procedural rule and may be raised in state court. *River Park*, 23 F.3d at 167.

15

applicable) decisions that burden the free exercise of religion, absent some compelling governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940)(applying free exercise clause to the states). Land use regulation often involves "individualized governmental assessment of the reasons for the relevant conduct," thus triggering *City of Hialeah* scrutiny. *Id.* at 537. For example, local officials may be asked to determine whether the historic preservation of a district outweighs the financial interests of a specific parcel owner. *Keeler v. Mayor & City Council of Cumberland*, 940 F.Supp. 879, 886 (D.Md. 1996). Thus, zoning is a common source of tension between religious organizations and local authorities, and sends many churches (temples, synagogues or mosques) to the courthouse.[10]

Modern free exercise claims are controlled by the seminal cases *Employment Div., Dept. of Human Resources of Oregon v. Smith* and *City of Hialeah*.[11] Under *Smith*, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *City of Hialeah*, 508 U.S. at 531. Under *City of Hialeah*, a law is not "neutral" if "the *object* of [the] law is to infringe upon or restrict practices *because* of their religious motivation." *Id.* at 533 (emphasis added). A substantial burden exists when the government pressures a plaintiff to modify her behavior and violate her beliefs, *Jolly v. Coughlin*, 76 F.3d 468, 477 (2nd Cir. 1996), by, for example, discriminating against her because of her religious belief, inhibiting her

---

[10] *See e.g., Love Church v. City of Evanston*, 896 F.2d 1082 (7th Cir.1990); *Biblia Abierta*, 129 F.3d 899; *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir. 1991); *Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221 (9th Cir. 1990); *First Assembly of God of Naples, Florida, Inc. v. Collier County, Florida*, 20 F.3d 419 (11th Cir. 1994); *Boyajian v. Gatzunis*, 212 F.3d 1 (1st Cir. 2000); *Daytona Rescue Mission, Inc. v. City of Daytona Beach*, 885 F.Supp. 1554 (M.D.Fla. 1995); *St. Paul's Protestant Episcopal Church v. City of Oakwood*, 1998 WL 1657172 (S .D. Ohio 1998); *Al-Salam Mosque Foundation v. City of Palos Heights*, No. 00 C 4596, 2001 WL 204772 (N.D.Ill. March 1, 2001).

[11] The court will address the applicability of the recently passed Religious Land Use and Institutionalized Persons Act below.

16

dissemination of particular religious views or pressuring her to forgo a religious practice. *Battles v. Anne Arundel Co. Bd. of Educ.*, 904 F.Supp. 471, 477 (D.Md. 1995). In the present case, the Zoning Ordinance as a whole and the special use provisions are neutral, generally applicable laws. First, these laws are neutral because the object of the Zoning Ordinance and special use provisions is to regulate land use and development. The record fails to support Plaintiff's argument that the Zoning Ordinance was enacted with the purpose of suppressing the celebration of religion in Chicago. As stated above, any burdens on the use of property were and are motivated by a legitimate concern for the health and safety of Chicagoans and the economic development of Chicago. *See Cornerstone Bible Church*, 948 F.2d at 472. Moreover, the Zoning Ordinance is generally applicable since it does not "impose burdens only on conduct motivated by religious belief," i.e. the use regulations impact or "burden" all land owners within the City who seek a special use permit. *Id.* at 543; *see International Church of the Foursquare Gospel*, 955 F.Supp at 880.. Plaintiffs maintain they have suffered hardship and inconvenience in their attempts to secure a location in which to celebrate their faith. For example, Plaintiffs argue the Zoning Ordinance process is an economic hardship on smaller churches because these churches lack the funds and resources to apply for and receive a permit. Must the City waive the application fees for churches ? Must the municipality provide free legal services to churches ? Must the government expedite special use permit applications filed by churches ?[12] The answer is no, because such obstacles face all similarly situated applicants. As the Seventh Circuit stated, "[W]hatever specific difficulties [the church] claims to have encountered, they are the same ones that face all rentors, not merely churches. The harsh reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them." *Love Church*, 896 F.2d at 1086. The "burden," i.e. the requirement that

---

[12] The amended special use provisions automatically approve applications submitted by a church if no action is taken on the application within 120 days, so the provisions arguably serve to expedite churches' applications.

an individual must go through the processes and meet the standards, is a requirement imposed on all special use applicants, regardless of the character of the proposed use. Therefore, the Zoning Ordinance and related provisions are valid neutral and generally applicable zoning regulations that impose no substantial burden to the free exercise of religion.

## Freedom of Speech and Assembly

Plaintiffs base their free speech and assembly claims on the presumption that the Zoning Ordinance implicates these First Amendment clauses by limiting the location of churches in the City. The First Amendment protections as to speech and assembly are not so all-encompassing as to include all activity in which an idea, goal or value is promoted. Zoning restrictions that have an incidental effect on the ability of people to congregate as they desire are subject to rational basis scrutiny. *See Village of Belle Terre v. Borass*, 416 U.S. 1 (1974). Here, Plaintiffs argue they are entitled to heightened scrutiny because they engage in religious speech.[13] However, the operation of a house of worship does not equate with "religious speech," any more than the operation of a shoe store equates with commercial speech. *There to Care, Inc. v. Comm'r of Indiana Dept. of Revenue*, 19 F.3d 1165 (7th Cir. 1994). The operation of a business, including a charitable business, is subject to zoning laws, even if the business makes its money by engaging in conduct within the core of the First Amendment. *Id.* at 1167. When the object of the law is unrelated to expression, e.g. harmonious land use here, the free speech clause is not implicated, even if the law in question limits the ability to disseminate one's message. *Id.* at 1168. For the above reasons, Plaintiff's First Amendments claims are rejected.

---

[13] Plaintiffs allege "plaintiff churches are 'merchants', businesses with a spiritual rather than a physical product." (Pl. Compl. at 10; Pl. Resp. Def. Mot. Summ. J. at 10). Commercial speech has traditionally been accorded fewer First Amendment protections than non-commercial speech. *See generally Central Hudson Gas and Public Service Commission*, 447 U.S. 557 (1980); *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989); *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995). If the court were to apply the accepted law of commercial speech to Plaintiffs' comments, Plaintiffs would lose, rather than gain, First Amendment protections.

## Illinois Religious Freedom Restoration Act

As the court is granting summary judgment to the City on Plaintiffs' federal claims, the court dismisses Count XIII pursuant to 28 U.S.C. § 1367(c). *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999)("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.") In light of the Illinois Supreme Court's recent ruling on this novel and complex state law, this court dismisses the claim arising from the Illinois Religious Freedom Restoration Act. *City of Chicago Heights v. Living Word Outreach Full Gospel Church*, - N.E.2d - , No. 87101, 2001 WL 290835 (Ill. March 22, 2001).

## Re-zoning of 1616 West Pershing Road

In Count XII, Plaintiff His Word Ministries to All Nations ("His Word") maintains it had a contingent option to purchase 1616 W. Pershing, but that the re-zoning of the property violated His Word's consitutitonal rights, specifically Plaintiff's free exercise protection, federal equal protection and federal procedural due process.

His Word's procedural due process argument was addressed above and in the Seventh Circuit's *Biblia Abierta* opinion. Under the law of the case, the re-zoning of 1616 W. Pershing was a legislative act. *Biblia Abierta*, 129 F.3d at 904-05. Thus, the legislative process provided the procedural due process and His Word is entitled to no more.[14] Similarly, His Word's free exercise claim is controlled by *Biblia Abierta*, where the Seventh Circuit ruled "[i]n passing the ordinances, the Zoning Committee and the City Council created neutral, prospective rules that apply to all current and future owners of the property." *Id.* at 904. Since *Smith*

---

[14] While the conduct of certain individuals (e.g. Huels) may be egregious and may even have risen to the level of dishonorable, the system in which they operate is not unconstitutional and is acceptable under a rational basis test. "That the plaintiffs were the target, and so far as appears the only target, of the amendment is plain... But this does not establish that the amendment was not a bona fide legislative measure. It is utterly commonplace for legislation to be incited by concern over one person or organization." *LC & S*, 2001 WL 294312, at *3.

19

and *City of Hialeah* hold there can be no free exercise claim if the law at issue is neutral and generally applicable, His Word's free exercise claim is dismissed. Further, since His Word's first amendment claim is dismissed, Plaintiff's federal equal protection claim is generic and subject to rational basis scrutiny. *See Coniston*, 844 F.2d at 467-68; *Biblia Abierta*, 129 F.3d at 904. The reasons for the re-zoning are rationally related to the City's interests in developing commercial areas and minimizing land use conflicts: prior to the re-zoning of 1616 W. Pershing, all four corners of Ashland and Pershing were zoned M and the majority of the property extending from the corners was zoned M. Thus, the re-zoning of 1616 W. Pershing to M passes the rational basis test.

## Religious Land Use and Institutionalized Persons Act

Plaintiffs amended their complaint to include Count XIV, a claim under the recently passed Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C.A. § 2000cc et seq.. The concept of a religious freedom restoration act began as the congressional response to the much-criticized Supreme Court decision in *Employment Division, Department of Human Resources v. Smith*. The federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4 (1994), like its state counterparts, sought to rescind *Smith* and restore what proponents refer to as the pre-*Smith* standard: the "compelling interest/least restrictive means" test found in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). In 1997, the Supreme Court struck down the RFRA in *City of Boerne v. Flores*, primarily on federalism grounds. *City of Boerne v. Flores*, 521 U.S. 507 (1997). The Court held Congress lacked the power under the Enforcement Clause of the Fourteenth Amendment to change the meaning of the First Amendment. Last year, Congress responded with RLUIPA, a law similar to RFRA.

Assuming that RLUIPA is constitutional, it does not effect the outcome, because RLUIPA is inapplicable to the present matter by its own terms. As stated above, the City amended its Zoning Ordinance in February 2000 and adjusted its policies concerning special use permits and related districts. By removing

any potential substantial burden, the City has avoided the threat of heightened scrutiny under RLUIPA.[15] 42

U.S.C.A. § 2000(5)(e). Thus, Defendant's motion for summary judgment on Count XIV is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED and

Plaintiffs' motion for summary judgment is DENIED. **IT IS SO ORDERED**.


**DATED**: March 30, 2001

**WILLIAM J. HIBBLER, DISTRICT JUDGE**

---

[15] (e) Governmental discretion in alleviating burdens on religious exercise:
A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.